Our next case for argument is 23-1169, Amarin Pharmaceuticals v. Hikma Pharmaceuticals. Mr. Keller, please proceed. Good morning, Your Honors, and may it please the Court. The District Court demanded too much of Amarin's complaint in this case. Under the governing pleading standards, a plaintiff need only plead a plausible theory of its case, and Amarin did just that in its theory of induced infringement against Hikma. Now, induced infringement requires three components. For me, Mr. Kelly, the issue here, correct me if I'm wrong, the label in this case does not have an infringing use, correct? Unlike GSK, where there was a finding by the jury that the label laid out infringement. Here, that's not the case. It's undisputed. The label itself does not lay out infringement. Your Honor, the indication in Hikma's label does not lay it out. We have theories in the case about different parts of the label and how they contribute to our infringement case. But all I've asked is, is it true that there's no dispute here, that the label itself does not lay out or instruct as to all the elements necessary for infringement? Your Honor, our complaint does allege that there are parts of the complaint, I'm sorry, of their label, that do lay out components of the infringement. But, Your Honor, Well, Your Honor, they have I'm asking a simple question. I actually thought this wasn't something I was going to get caught on. So help me understand why are you being, you know, not difficult, I don't mean that in a bad way, but what, I don't understand. I thought that it was undisputed and it was found, and I didn't understand you to appeal, that the label itself does not set out instructions that amount to infringement. Well, Your Honor, our complaint does allege that there are portions of the label that do amount to instructions as they would be understood. Standing alone. The label standing alone is the question. The label, our case is not about the label standing alone. So that's Your Honor's question. That's your question. Our case is not about the label standing alone, but to be clear, we do rely on portions of the label. For example, HICMA has raised the issue with the warning in the label and how it can be that the warning has absolutely nothing to do with infringement. Well, there's a claim limitation that talks about not prescribing the drug to a patient. But your claims also require extra label statements. I mean, your inducement claims. Yes, Judge Albright. Our theory of the case has to do with additional factors as well. We do rely on the label for certain components of the claim, certain limitations. But the disputed issue, to bring it back to this case, is the CV indication. That is the cardiovascular risk reduction indication on the label. Number one, the context of this case is 12 v. 6, right? Correct, Your Honor. And so all we had to do is lay out a plausible theory of induced infringement, which requires actual infringement. That's not disputed. It requires intent to induce. The district court agreed with us that our evidence went to intent. And finally, active actions in support of that theory. And we have those here. We have those with statements that are outside of the label. We have them with the press releases and the website. Yes. Okay, so why don't we start with the website? Because that one I feel like is for sure your biggest argument. When you look at page 820, is that the website? Am I missing it? Is that the right page? Yes. Well, I mean, Lord knows it's tiny. It's so tiny I couldn't read it. I probably can't even read it with my reading glasses. But doesn't it say there something to the effect of Hickman's generic is not approved for everything? Yes. It says Hickman's generic version is indicated for fewer than all approved indications. And also it says that this is an AB rating. And my understanding of AB rating is that that means it's generic, but only for what's on the label, correct? It means it's therapeutically effective for what it's labeled for, Your Honor. So if the infringing product, allegedly infringing product, if the generic that's being sold, if their website simply says AB rated, and we've also been through the fact that their label itself does not teach infringement standing alone, so how can calling them AB related be an act of inducement, especially when they've got that little disclaimer on there? Because, Your Honor, the website says more than that. It says that the therapeutic category is hypertriglyceridemia. And it's the combination of that therapeutic category and the statement of equivalency that we say, combined with everything else, is at least plausible that somebody in this field would read that as an indication that this could be used for treating the off-label use, the patented use for which only Ameren has authority to distribute the drug, and that's for treating cardiovascular risk in patients that do not suffer from severe hypertriglyceridemia. In fact, if a physician were to prescribe this drug to a patient in the hypertriglyceridemia category, they would necessarily be practicing, if they were prescribing under any indication, they would necessarily be practicing the patented invention because they would be prescribing it for the only indication for which it can be prescribed to people with hypertriglyceridemia, and that's to reduce their cardiovascular risk. So, Chief Judge Moore, to bring it back to your question, yes, they have this tiny little disclaimer at the bottom, which, by the way, doesn't say what they're not indicated for, and yes, they refer to AB rating, but most significantly, they refer to a therapeutic category for which they simply do not have approval to market throughout that entire category, hypertriglyceridemia. Now, I would also point, Your Honor, to the press releases, which we contend are part of the factual foundation in this case, part of our plausible pleading, and in those press releases, they refer to the fact that their drug is the equivalent of Vasepa, that it's the generic version of Vasepa, and they refer obliquely to multiple uses of Vasepa. Yes, the press releases, the March and the September 2020 press releases, they do refer to treating severe hypertriglyceridemia, but they also say that Vasepa is indicated only in part for those treatments, and they don't demarcate in those press releases between the treatments for which it is indicated and the treatments for which it is not, and, Your Honor, that is very similar to the press releases in GSK. In GSK, the press – What is the obligation on a generic manufacturer who is selling a product that may or may not infringe existing patents? Is there any kind of duty, or should there be a duty of clarity to make clear in all of one's advertising press releases what is and is not infringing? Well, Your Honor, they certainly should, when they make those press releases, consider the effect on the listener, and if they're going to say things that encourage or obliquely point to the indication for which they don't have approval, they're running the risk of a case just like this. Is there a fact question here as to what a reasonable physician would understand that the product could be marketed for? Yes, that is the fact question in this case, and that's what Magistrate Judge Hall recognized when she recommended that the motion to dismiss be denied because the question isn't how Judge Andrews would read these labels or how he would read the press releases or what any of us think they mean. The question is what a physician, what a health care professional would do with those press releases with that website. How would the question – I haven't had one of these cases myself – how would the question be framed to the jury, the fact question, for them to resolve in this case? Well, Your Honor, it would come in through testimony, for example, of people in the health care industry, and that's exactly what happened in GSK. In GSK, if you look through that opinion, you'll see detailed discussions of testimony by Dr. McCullough, and that testimony was about how physicians read press releases, what they do with that information, and perhaps in this case it would be about treatments in this field, particularly when it comes to treating cardiovascular risk, for which there really were no treatments like this until this approval. And specifically, what is the question you think the jury would have to answer that in essence Judge Andrews answered by granting the motion to dismiss? That's what I'm trying to get to. I understand the factual issue, but what question should have survived the motion to dismiss and should be answered by a jury? Whether or not the public statements in the website, in the press releases, would have suggested or conveyed to a health care professional the patented use. And all of that was in your complaint in terms of your allegations of infringement? Oh, absolutely, Your Honor. We referred to how physicians would read it and what it would convey to those in that field. What it would convey concerning the intent of the seller? No, Your Honor. Well, intent is relevant to inducement. It is, Your Honor, and the district court, and this is at Appendix Page 8, the district court acknowledged that our evidence did go to intent. And that's that chart that shows that the vast majority of prescriptions written for Vasipa are for the off patent, or I'm sorry, the off label used for Hikma's label, the patented use for Ameren's indication, which is treating cardiovascular risk. They understood that. That's their demonstrative from the earlier case. So the district court said that that understanding by Hikma, along with their statements in their press release about the U.S. total sales of Vasipa approaching a billion dollars, that they understood what would happen and that that was evidence of intent. So we don't think that this dispute right now is about intent and that whether Judge Andrews thought that we hadn't plausibly pled intent. It's simply whether we had plausibly pled affirmative actions that would have conveyed or demonstrated this potential use to health care professionals. That's exactly the type of evidence that was considered in GSK. And I see that I'm into my rebuttal time, so unless the court has additional questions. That's fine. Thank you, Mr. Kelly. Mr. Kline. Good morning. May it please the Court. Ameren argues that physicians may infer inducing conduct from vague statements. That's not the law. The Patent Act does not impose liability for inferred inducement. The statute expressly requires actively induced infringement. And this Court held in Takeda, the Horizon case, and many other cases, that active inducement, this doesn't relate to intent, it's conduct, it's culpable conduct. Active inducement requires affirmative steps in this context to tell health care providers that they should perform, not even may perform, should perform each and every element of an asserted patent claim. Takeda, which was not a Hatch-Waxman case, it was a 271B case, said merely describing an infringing mode is not the same as recommending, encouraging, or promoting an infringing use, or suggesting that an infringing use should be performed. Vague language, this is quoting from Takeda, vague language cannot be combined with speculation about how physicians may act to find inducement. Mere knowledge of direct infringement or off-label use cannot be used to establish induced infringement. But Hickman said in his press release, at least twice, that this is a generic equivalent. Seems to be a fact that 75% of the usage is or is expected to be covered by the patent. And obviously Hickman knew that. So I know you said inducement needs to be expressed, but couldn't a reasonable fact finder find that that was expressed? Your Honor, that type of evidence could go to knowledge, but it doesn't go to the conduct element of induced infringement. And this Court in GSK took pains to explain, and I'll quote because this holding, I believe, is directly on point. The Court in GSK agreed, generics could not be liable for merely marketing and selling under a skinny label, omitting all patented indications, that's what we have, or for merely noting, without mentioning any infringing use, press release and the website don't mention any infringing use, that FDA had rated a product as therapeutically equivalent to a brand-name drug. That's directly on point. Well, that's because those press releases talked about A-B rating, and that's why I was questioning Mr. Kelly about the website, which is A-B rated. So, I mean, I'm not concerned with your website, but I am concerned with your press releases, because it's different to say something is A-B rated, because I understand the industry, that means equivalent for the uses on Hickman's label. But that's not what you say on the press releases. You say it's a generic version of Amarin, that's Amarin's drug. So that's different. That's a much broader statement. Your Honor, in GSK, on page 1336, the comment was that the dissent criticizes our analysis, claiming we have weakened intentional encouragement, because simply calling a product a generic version or generic equivalent is now enough. And the Court said, no, that's not enough. It's literally the same phrase that's used in the press release. On those press releases, they said A-B rated, which directed one of skill in the art to look at the label. That's right. But our label, unlike in GSK, does not actively induce infringement. But that's the difference between their press release and your press release, is their press releases, when they said it was generic equivalent, they also said for A-B rated purposes. Your press release doesn't do that. It doesn't have that limitation in it. I have two responses. The first response is the press release in GSK referred to the product as a cardiovascular agent, which gets pretty close to the patent claims. We don't refer. Our press releases don't call Hickman's product a cardiovascular agent, and it doesn't even talk about cardiovascular in the press release. All it says is it's a generic version, which this Court in GSK said, that's not enough. Yeah, but you say we said that's not enough. Your problem is this is 12B6. That was following a jury trial. So we're here at the 12B6 standard stage to say could somebody think that this is plausibly enough? Not it is enough, but plausibly. It's not plausible for two reasons. One, and this goes to I think it was Judge Lurie's question, the Takeda case made it clear that the generic or the defendant has no obligation to disclaim infringement. The quote on footnote four is Takeda needs to show that Hickman took affirmative steps to induce, not affirmative steps to make sure others avoid infringement. Their allegations, whether correct or not, or approvable at trial or not, but I have to accept as true, is that by calling it a generic version in this press release, it would cause health care providers and patients to believe that this should be prescribed for all of the equivalent uses. Isn't that a fact question? It is not a fact question because you can't look at this press release. The press release doesn't even describe the cardiovascular patented uses, much less induce infringement. In order to infer inducing conduct, you would have the reader would have to go to a document outside the press release, the VASIPA label, and make assumptions that, well, now I can use Hickman's product for any indication in the VASIPA label. That's not what the press release says. With all due respect, I don't think it's inferential. I think on page 709, you all say Hickman's a generic version. Full stop. And then at the bottom, you point out the number of sales that the brand has had, which includes the non-severe HTG sales, 75% of which are, in fact, the non-severe HTG sales. So, I mean, maybe the point about the sales figures is inferential, but the earlier statement about Hickman's product can be sold as a generic version of Amarin doesn't seem inferential to me. It seems like an actual statement encouraging use for the broad sweep of things that this generic can be used for instead of the brand without any narrowing. So, I don't know. I don't know that they'll win at the end of the day, but I'm really struggling with how I'm supposed to say at the 12B6 stage that this isn't enough. And what I care about, see, to follow up is why should the judge – it sounds to me like the district judge has made the decision that it would support what you say when it should be a jury that hears evidence from both sides that decides whether you're right in your position or not. Well, two responses. The first one is there's no plausible allegation. There's no plausible allegation that Hickman is actively encouraging a healthcare provider to actually perform every step of the patented method. The patented methods are very specific, very specific, and the patented methods are not even described. And in the Horizon case, the label literally described the entire patented method. And the court said expert testimony is irrelevant because the label itself doesn't instruct healthcare providers to actually perform each and every step. There's not even a description of the patented methods in the press release. And the second point, and in a sense this is the elephant in the room, is that this is not just a typical 12B6 case. The entire industry is watching this case. It's a test case. It goes back to the entire controversy with GSK. And if merely calling a generic product a generic version is sufficient to get past the pleading stage, Section 8 is dead. It would be economically irrational. It's not a Section 8 case. Well, it is. We filed a Section 8. But it's not a Section 8 case anymore. Well, that's the point. It's not. This is not a Section 8 case. Your Honor, the point is we weren't sued under 271E because of the Section 8. And what's going to happen is brands are going to... So this isn't going to unravel Section 8. How is it going to unravel Section 8? This is not a Section 8 case. It will absolutely unravel Section 8 because brands will lie in wait when there's a Section 8 carve-out and not sue under 271E, and instead wait until the launch and then sue under 271B for damages based on statements like, oh, you called it a generic version, now they can get past the motion to dismiss. It would be economically irrational for any generic to rely on the Section 8 carve-out. If they could get sued, if they could get past, they can survive 271E, but then they can't get past 271B. All you will have to do if you want to avoid future litigation is in your press release be more specific. We have a generic version which can be used to treat severe HTG in the same fashion as the branded version, the SEPA. And then you're off the hook. It doesn't unravel Section 8. It doesn't make it so generics can't sell. It just makes it so generics, when they're claiming they're generic, have to explain what they're generic for. Takeda, the... How hard is that? It doesn't feel like a hard burden. It feels like you add two words to your press release. Two words. The Takeda case makes it clear that's not our burden. Oh, no. I didn't say you have to say you have to discourage people from using it for the other things. I'm just saying, when you say you're a generic equivalent, say what you are a generic equivalent for. But the only indication described in the press releases is HCMA's indication. There's no way to get from... You point to the total sales, 919 million, 75% of which are for things you're not supposed to be doing. So the question there is, would a health care provider... And I have no idea. And you may witness some summary judgment. I don't agree with Judge Albright this has to go to a jury. Because I don't know that they're going to be able to come up with proof to establish, for example, paragraph 122 in their complaint, that health care providers would have read this and would have been inspired by it to actually prescribe for uses beyond severe HTG. I don't know that they can come up with evidence to survive a summary judgment on that point. But the plausibility question for me is a different question. And actually, I was about to say, or I think we're all struggling with the 12B6 stage. I was about to say, this seems to me like a summary judgment. I was saying a jury question. But you could eliminate that by having a summary judgment down the road, as opposed to which would be reviewed by this panel in a completely different way than a rule 12B6. I disagree that summary judgment in this case would be any different than what we're looking at now. Because the statements, this is not a situation like GSK or Grunenthal where there's ambiguity in a statement. And the statement could plausibly be construed broadly as encouraging each and every step of a patented method. There's no such statement here. So the statements aren't going to change. There are no oral representations, you know, and a debate as to whether they were said or not. We know what the statements are. They're not going to change between now and summary judgment. Judge Andrews told Ameren, if you want to amend your complaint. What will change between now and summary judgment is I'm assuming that you'll find a bunch of doctors that say either, hey, we don't bring press releases, or if we had read this press release, we would not have been persuaded that this press release is telling us to use or prescribe Hikma for all the same indications as the SEPA. Or you would have them say, despite the word generic version, hey, I read labels. And I wouldn't have gone beyond what's on the labels. There are a million ways in which you can present evidence that on summary judgment could disprove this allegation. But right now it's an allegation I have to accept is true. And their allegation is that this word, generic version, quote, communicates to and instructs health care providers that it should be used for all indications. How do I not accept that? I can accept that as true. I can accept that as true. How do I keep that complaint? Your Honor, you don't have to accept as true. You can accept what the document says. The case law is clear. You don't have to accept conclusory allegations if they attach the document. So you know what the statement is, and you compare the statement to the claims, and it doesn't plausibly, the statements don't plausibly tell doctors, use this product to reduce cardiovascular death. Use this product in combination therapy with a different product, a static. How do I know? How do I know any of that? Why do you assume that I have any knowledge about how a doctor would understand the words, generic version of the SEFA and what it means in terms of what indications this generic can and cannot be used for? How in the world do you think I have knowledge of that? That's the Verizon case. The Verizon case. You think because I maybe read the Verizon case, which by the way I didn't, you think maybe because I read the Verizon case I should know what doctors do and don't do? No, no. The point is whatever doctors do and don't do isn't relevant to whether the statements, the alleged statements, plausibly and actively encourage each and every step of the patented method. And that's what Horizon said. Horizon said, I don't care what experts have said. This was summary judgment. And so the, yeah, and the Verizon case addressed the same type of situation we're dealing with here. In fact, it was closer, it was a closer call because in Horizon they literally described every step of the patented method. They didn't actively encourage it. I see I'm out of time. Okay. Thank you very much, Mr. Kelly. Thank you, Your Honor. Just a few quick points. First of all, it's striking how thin HCMA is trying to slice this because in GSK the advertisement which said the drug was a generic equivalent and referred broadly to there being multiple uses was found to be sufficient evidence for a jury to actually find inducement. And what they're saying is that a press release that calls something a generic equivalent and refers to multiple uses by calling one only in part, that that is not even plausible. So they're taking something that was enough for a jury to find inducement and they're going all the way to it wasn't even plausible just because of a little tweak in the fact that in one press release they broadly referred to multiple uses and in their press release they referred to multiple uses in a different way. That just can't be. Let me follow up on something the opposing counsel said that I was going to ask about. Judge Andrews, when he was either about to grant him 12 v. 6, said, would you like to amend your complaint? I assume they were arguing that it's missing what he said. It's missing allegations that they practice each element or whatever it is. And you all said no. How does that impact our concern that this was a 12 v. 6 rather than a summary judgment motion just procedurally and that the district court gave you a chance to add anything you wanted into the complaint and make it more robust? And how does that impact our decision about whether what Judge Andrews did was correct or not at this procedural stage? Your Honor, it shouldn't impact your decision at all. The question in this case is whether our amended complaint plausibly pled induced infringement. And it did. Whether or not we could have filed a different complaint that I guess in Judge Andrews' view actually proved infringement, that's a separate question. We didn't have to do that. This complaint was good enough. It had plausibly laid out our theory of induced infringement. Now, Counselor Hickman has referred a couple of times this morning to how complicated the claims are and to how many different limitations are. And I'd like to just direct the Court's attention to, for example, Claim 1 of the 861 patent, which is on the inside cover of our blue brief. There's only one step in this claim, and that's administering 4 grams of facepa to reduce cardiovascular risk. The only difference between this claim and what is indicated on the Hickman label is the purpose for which they are prescribing facepa. That's the difference. So the question is not whether or not they hit every detail. For example, the 537 patent, Claim 1, which is also on the inside cover, that does have additional details. And that's why, when this argument began, I pushed back a little bit on Chief Judge Moore because there are some additional limitations in that claim, and we did need some stuff in the label to get to some of those limitations. But the issue now is simply the use of facepa to treat cardiovascular risk. Physicians knew what facepa was approved for. They knew about both indications. They saw a press release that said it was the generic equivalent. They saw the press release refer to the— Out of curiosity, does the Hickman label tell people to administer 4 grams? I believe it does. Yes, so, Your Honor, on page 696. You'll see the dosage and administration. The daily dose of icosapen ethyl is 4 grams per day. It's about midway down. This is the Hickman label? Yes. Not the placebo label? Right, and if you go back to 694, you'll see it says, icosapen ethyl, excuse me, Hickman Pharmaceuticals at the top of the page. I don't understand, then. Why then is the label not actually encouraging infringement directly? Because of the purpose of the— That's just the statement of intent it used. Or was it construed as a limitation? Your Honor, the parties— Excuse me, but I'll answer the question. Yes, the parties agreed that the preamble was limited. Oh, you agreed the preamble was limited. Yes. Okay. The parties agreed what? That the preamble was limited. So if there are no further questions, thank you.